IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES | CRIMINAL ACTION |
|---|---|
| v. | |
| SHAWN JASON | NO.  24-358 |

HODGE, J.                                                                                      May 4, 2026

## MEMORANDUM

### I.    INTRODUCTION

Before the Court is Defendant Shawn Jason's ("Defendant") Motion to Suppress Physical Evidence pursuant to a Geofence Warrant (ECF No. 72 (the "Motion")). Defendant is charged in this case with one count of Hobbs Act robbery; one count of attempted Hobbs Act robbery; one count of using a firearm during a crime of violence, which is the robbery; and one count of felon in possession of a firearm.[1] (*See generally* ECF No. 115.) The charges stem from Defendant's alleged involvement in the robbery and attempted robbery of two Pennsylvania pharmacies: (1)

---

[1] The Court notes that the pending motion and response were filed prior to the issuance of the Superseding Indictment on February 12, 2026. The "filing of a superseding indictment does not have an effect on the pretrial motions filed on the original indictment 'unless the district court has ruled that the superseding indictment moots the pending motions.'" *United States v. Bazuaye*, No. 03 CR. 12, 2004 WL 784835, at *5 (S.D.N.Y Apr. 12, 2004) (quoting *United States v. Gonzalez*, 897 F.2d 1312, 1317 (5th Cir. 1990)), *aff'd*, 311 F. App'x 382 (2d Cir. 2008); *see also United States v. Harvey*, No. 2:12-cr-113, 2014 WL 657595, at *1 (W.D. Pa. Feb. 20, 2014) ("[B]ecause the Superseding Indictment re-asserts many of the charges in the original Indictment, the Court will resolve all pending motions."). Superseding indictments may impact a court's ability to decide pending pretrial motions where the indictment "change[s] the circumstances surrounding" such motions. *United States v. Zuniga*, Case No. 2:18-cr-00224, 2020 WL 1516970, at *3 (D.N.J. Mar. 30, 2020). Because the Superseding Indictment does not alter the circumstances surrounding the pending motions, the Court will resolve the motions without requiring Defendant or the Government to re-file.

the CVS Pharmacy located in the Glenside section of Abington Township in Montgomery County and (2) the CVS Pharmacy located at 334 Baltimore Pike in Springfield Township. (*Id.* at 1–5.)

In the Motion, Defendant argues that the Government improperly executed a geofence search warrant that was overbroad and lacked probable cause individualized to a specific device. Defendant further asserts that the warrant exceeded the jurisdiction of the Montgomery County Court that issued it. Defendant moves to suppress the data obtained from the geofence search and all physical evidence and derivative information obtained in the investigative chain that was initiated by use of the search. The Government filed a response in opposition to the Motion. (ECF No. 97.)

For the reasons that follow, the Court denies Defendant's Motion.

## II.    BACKGROUND[2]

The Court presumes familiarity with the facts of this case, which have been more extensively detailed in a memorandum denying Defendant's other motions to suppress (to be docketed contemporaneously with this memorandum). The Court therefore summarizes only those facts most relevant to the instant motion.

In February and March of 2024, a string of armed robberies occurred at three different CVS pharmacies in Pennsylvania and Delaware. On February 22, 2024, between 2:30 and 2:50 p.m. EST, a man completed an armed robbery at the CVS pharmacy in the Glenside section of Abington Township in Montgomery County, Pennsylvania (the "Abington Robbery"). (ECF No. 97 at 3; ECF No. 72 at 3.) On March 8, 2024, between 6:30 and 7:30 p.m. EST, a man attempted an armed robbery at the CVS pharmacy at 702 Naamans Road in Claymont, Delaware (the "Delaware Attempted Robbery"). (*Id.*) On March 9, 2024, between 10:20 and 11:05 a.m. EST, a man

---

[2] The Court adopts the pagination supplied by the CM/ECF docketing system.

attempted an armed robbery at the CVS pharmacy at 334 Baltimore Pike in Springfield Township, Delaware County, Pennsylvania (the "Springfield Attempted Robbery"). (*Id.*)

Detective Elizabeth Cartwright ("Det. Cartwright") of the Abington Police Department sought the assistance of other law enforcement agencies to identify the perpetrator of the Abington Robbery. (ECF No. 97 at 4.) To that end, Det. Cartwright disseminated information about the nature and circumstances of the armed pharmacy robbery to other law enforcement agencies, as well as descriptions about the clothing the offender wore, the firearm he used, and the vehicle he used to flee the scene. (*Id.*) Detectives in the City of Philadelphia and Cheltenham Township informed Det. Cartwright of armed robberies in their jurisdictions that were committed in a similar fashion by a similar offender. (*Id.*) While investigators attempted to identify the perpetrator of those crimes, the two attempted robberies discussed above were reported—the Delaware Attempted Robbery and the Springfield Attempted Robbery. (*Id.*) Based on the clothing worn, offender description, and the temporary license plate affixed to the getaway vehicle, investigators believed the perpetrator of the two attempted robberies was likely the same individual who committed the Abington Robbery. (*Id.*)

Relevant to this Motion, on March 8, 2024, at 1:46 p.m. EST, a Timing Advance Tower Warrant, also known as a "geofence warrant," was served on T-Mobile to obtain information to identify the users and/or possessors of cell phones near the scene of the Abington Robbery. (ECF No. 74 at 5.) The warrant was limited to devices within the 0.25-mile radius around the scene of the robbery between 2:30 p.m. and 2:50 p.m. on February 22, 2024. (ECF No. 72 at 5.) On March 18, 2024, Det. Cartwright sought another geofence warrant from the Montgomery County Court of Common Pleas for the cell towers servicing the areas of the Delaware Attempted Robbery and the Springfield Attempted Robbery (collectively with the March 8, 2024 warrant, "the Geofence

3

Warrants"[3]). (ECF No. 72 at 3; ECF No. 74 at 2–8.) Attachment A to the warrant lists the "Items to be searched and seized" as follows: "This warrant applies to a Timing Advance 'True Call' area search, also known as geo-fencing, for all records and unique device/user identifiers pertaining to Timing Advance location information during the following listed dates, times and geographical boundaries (radius is the distance from the GPS point in all directions). . . ." (ECF No. 74 at 3.) The clause was followed by a location radius of 0.25-miles around the scene of each incident. (*Id.*) The warrant was temporally limited to 6:45 p.m. to 7:15 p.m. EST on March 8, 2024 for the area near the Delaware Attempted Robbery, and 10:20 a.m. to 11:05 a.m. EST on March 9, 2024 for the Springfield Attempted Robbery. (*Id.*) The data collected from the search warrant identified one device that was present at the scenes of both incidents: an iPhone with International Mobile Equipment Identity ("IMEI") 353834925697265 and International Mobile Subscriber Identity ("IMSI") 310260632294724. (ECF No. 97 at 4–5; ECF No. 72 at 3–4.)

Authorities then prepared and served a warrant on T-Mobile for all available records and information associated with that IMSI and IMEI. (ECF No. 72 at 4; ECF No. 74 at 30–31.) T-Mobile provided records which revealed that the IMEI was associated with two phone numbers: 717-857-4110 ("the 717 number") and 267-276-5572 ("the 267 number"). (ECF No. 74 at 31.) Per T-Mobile records, the 717 phone number was effective from February 5, 2024 to March 9, 2024. (*Id.*) On March 9, 2024, the data for the 717 number ended, but the same IMEI was used for a

---

[3] Neither Defendant nor the Government has filed an exhibit for the March 8, 2024 geofence warrant that was obtained to investigate the Abington Robbery. Defendant references the existence of the March 8 geofence warrant in the Motion (ECF No. 72 at 3); the March 18, 2024 geofence warrant also discusses it (ECF No. 74 at 5; ECF No. 99 at 5). Throughout the Motion, Defendant appears to make challenges to the geofence warrants collectively. As such, the Court infers that Defendant challenges the validity of both the March 8 and March 18, 2024 warrants and that there are no differences in the probable cause and particularity challenges Defendant asserts for each warrant. The Court determines the Motion based on the singular warrant now before it.

different phone number, 267-415-5848, which became effective in the afternoon of the same day. (*Id.*) Law enforcement databases revealed that both the 717-857-4110 and 267-415-5848 phone numbers were associated with Defendant. (*Id.*)

Det. Cartwright, in coordination with other law enforcement agencies, subsequently obtained warrants to continue the investigation into Defendant, including an arrest warrant, a warrant to use a StingRay to identify Defendant's real-time location prior to the arrest, a warrant to search the hotel room where Defendant had been staying, a warrant to search a Nissan Rogue rented by Defendant, a warrant to search an iPhone seized in the search of the hotel room, and a warrant to obtain Defendant's historical cellphone records from AT&T. (ECF No. 72 at 4–5; ECF No. 74.)

### III.    PROCEDURAL HISTORY

On October 8, 2024, a grand jury returned a four-count Indictment charging Defendant with (1) robbery which interferes with interstate commerce, in violation of Title 18 U.S.C. § 1951(a) (Count I); (2) attempted robbery which interferes with interstate commerce, also in violation of Title 18 U.S.C. §§ 1951(a) and 2 (Count II); (3) using, carrying, and brandishing a firearm during a crime of violence, in violation of Title 18 U.S.C. § 924(c)(1)(A)(ii) (Count III); and (4) felon in possession of a firearm, in violation of Title 18 U.S.C. § 922(g)(1) (Count IV). (ECF No. 1.) Counts I and III relate to the Abington Robbery, Count II relates to the Springfield Attempted Robbery, and Count IV relates to the recovery of the firearm in the Nissan Rogue. (ECF No. 26 at 8.) On February 12, 2026, a grand jury returned a Superseding Indictment bringing the same charges, absent the aiding and abetting charge in violation of 18 U.S.C. § 2. (ECF No. 115)

On November 4, 2025, Defendant filed the instant motion to suppress physical evidence pursuant to the geofence warrant. (ECF No. 72.) On January 16, 2026, the Government filed its

opposition to the Motion. (ECF No. 97.) On February 2, 2026, the Court held a motions hearing regarding the fully briefed motions. (ECF No. 111.) The Court now addresses the Motion.

## IV.    LEGAL STANDARD

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. Amend. IV. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). A search warrant is valid if: (1) a neutral and disinterested magistrate issued it; (2) those seeking the warrant demonstrate probable cause to the magistrate; and (3) the warrant particularly describes the things to be seized and the place to be searched. *United States v. Cooper*, No. 22-1510, 2023 WL 3336645, at *4 (3d Cir. May 10, 2023) (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979)). A magistrate judge may find probable cause for police to seek, obtain, and execute a search warrant when, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in [the] particular place" to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). An affidavit does not have to express certainty about finding evidence in the premises to be searched. Rather, the Third Circuit has said that "an issuing court need only conclude that it would be reasonable to seek the sought-after objects in the place designated in the affidavit; a court need not determine that the evidence is in fact on the premises." *United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005). A court reviewing a magistrate's finding of probable cause need not determine whether probable cause actually existed, but rather whether there was a "substantial basis for finding probable cause." *United States v. Jones*, 994 F.2d 1051, 1054 (3d Cir. 1993).

Evidence discovered during an unreasonable search or seizure is considered "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–85, 488 (1963). A defendant may

move to suppress such evidence pursuant to Rule 41(h) of the Federal Rules of Criminal Procedure. Once a defendant has established a basis for his motion to suppress, the burden is on the government to show that the search or seizure was reasonable. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). However, "there is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (citing *Davis v. United States*, 564 U.S. 229, 236 (2011)). Rather, "[a]pplication of the exclusionary rule is . . . limited to those 'unusual cases' in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 918 (1984)). Thus, where the particular facts of a case indicate that law enforcement officers "acted with an objectively reasonable good-faith belief that their conduct was lawful . . . there is no illicit conduct to deter" and "exclusion cannot pay its way." *Katzin*, 769 F.3d at 171 (citation modified).

## V.    DISCUSSION

### A.  Explanation of Geofence Warrants

At the motion hearing on February 2, 2026, the Government sought to emphasize the difference between the geofence warrants at issue here and the geofence warrants that law enforcement may have pursued in other cases, specifically those leveraging more detailed GPS and other location data. Defendant has also relied on cases in other jurisdictions considering Google geofence warrants. Resultingly, a brief overview of the data sought in the warrant at issue is helpful for assessing the Motion now before the Court.

In the instant matter before this Court, the Geofence Warrants sought "Timing Advance Data," which the Government described in its opposition to the Motion as:

Cellular service providers often maintain specialized historic location data for engineering and network optimization purposes through the normal course of business, commonly referred to as Timing Advance data. For cell phones to function properly on a cellular network, all devices must be properly synced in time to the cell towers they are communicating with. This is facilitated through a process in which a signal travels from a cell tower to a device and back, measuring the time it takes for that communication to occur. Through this signaling event, an estimated distance a device was located from a tower can be calculated by a cellular network and reported in its Timing Advance data report. This estimated distance can then provide a more precise area a phone was located compared to just the cell tower and sector used by a device that is recorded in traditional call detail records.

. . .

A cellular carrier responding to a request for "Timing Advance" or "area search" provides certain cell data for communications and interactions that devices have with towers in a delineated area, for a discrete period of time.

Timing Advance data returned in response to a T-Mobile Timing Advance Area Search Warrant (Geofence) only includes the IMEI and IMSI numbers associated with the device connected to the tower, but not the phone number. Thus, the Timing Advance Area Search Warrants reveal only the device or account identifiers, which, without further investigation or evidence, cannot be used on their own to identify the user.

(ECF No. 97 at 6–7.) A request for Timing Advance Data seeks all responsive records within a geographically limited area around a specific location during a designated time frame. (*Id.* at 7–8.) Timing Advance Data does not include subscriber information or the content of calls or connections. (*Id.* at 7.) Timing Advance Data geofence warrants differ from the geofence warrants that are directed to Google, as the latter involves a unique investigatory process and additional data production. This process was helpfully explained in *United States v. Chatrie,* 590 F. Supp. 3d 901, 914 (E.D. Va. 2022)[4]:

When law enforcement seeks a geofence warrant from Google, it (1) identifies a geographic area (also known as the "geofence," often a circle with a specified radius), (2)

---

[4] The Fourth Circuit, in a per curium opinion en banc, affirmed the lower court's denial of the defendant's motion to suppress. *United States v. Chatrie*, 136 F.4th 100 (4th Cir. 2025), *aff'd* 590 F. Supp. 3d 901 (E.D. Va. 2022), *cert. granted* No. 25-112, 2026 WL 120676 (Jan. 16, 2026). The en banc panel's concurring opinions varied in their assessment of whether the collection of geofence location data constitutes a Fourth Amendment search at all. The Supreme Court has granted certiorari on the question of whether the execution of the geofence warrant violated the Fourth Amendment.

identifies a certain span of time, and (3) requests Location History data for all users who were within that area during that time.

Notably, to complete the first step of the process, Google "must search *all* Location History data to identify users whose devices were present within the geofence during the defined timeframe." *Id.* at 914–15 (citation modified). After law enforcement reviews the de-identified data provided in step one, "if a user's location fell within the geofence at [step one], law enforcement can obtain *all* location points for identified users over an expanded timeframe" in step two, and "no geographic barrier confines the information searched." *Id.* at 916 (emphasis in original). Finally, in step three, drawing from the de-identified data produced in the preceding steps, law enforcement may compel Google to provide account-identifying information. *Id.*

Thus, a geofence warrant seeking Timing Advance Data is "significantly less precise than a Google geofence search, which collects Global Positioning Satellite (GPS) data."[5] *United States v. McCracken*, No. 24-3-1, 2025 WL 3034953, at *2 (E.D. Pa. Oct. 30, 2025). During the Motion hearing on February 2, 2026, the Government's expert, Mr. Anthony Vega, reaffirmed that the Geofence Warrants here did not result in collection of GPS data—rather, the data returned in the warrant request only identified the devices in the specified geofence area.

**B. Validity of the Geofence Warrants**

Defendant first challenges the validity of the Geofence Warrants on probable cause and particularity grounds. For the reasons below, the Court finds Defendant's arguments unpersuasive.

---

[5] In fact, Google's Location History tool goes beyond GPS data, as it may also draw from "Bluetooth beacons, cell phone location information from nearby cellular towers, Internet Protocol ("IP") address information, and the signal strength of nearby Wi-Fi networks." *Chatrie*, 590 F. Supp. 3d at 908.

### 1.  Application of the Fourth Amendment to the Geofence Warrants

"[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' [] 'reasonable,' or [] 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). For Fourth Amendment protections to attach to a person's privacy interest, the person must have "exhibited an actual (subjective) expectation of privacy," and that expectation must be "one that society is prepared to recognize as 'reasonable.'" *Id.* In *Carpenter v. United States*, 585 U.S. 296, 309–10 (2018), the Supreme Court held that an individual maintains a legitimate expectation of privacy in the record of their physical movements as captured through cell site location information ("CSLI"). The government's acquisition of seven days of the petitioner's historical CSLI therefore constituted a search requiring a warrant. *Id.* at 310 n.3. The Court emphasized that the "narrow" decision did "not express a view on matters not before [the Court]: real-time CSLI or 'tower dumps' (a download of information on all the devices that connected to a particular cell site during a particular interval)." *Id.* at 316.

In passing, Defendant asserts that individuals located in the 0.25-mile radius around each of the robbery sites had a reasonable expectation of privacy in their location information. (ECF No. 72 at 6 (citing *Katz v. United States*, 389 U.S. 347, 351–53 (1967)).) The Government contends that Defendant has failed to demonstrate that he has a reasonable expectation of privacy in the Timing Advance data sought in the Geofence Warrants, as is required to sustain a Fourth Amendment challenge. (ECF No. 97 at 17.) The Government argues that *Carpenter* was a limited holding that "recognized a Fourth Amendment privacy interest only in certain long-term, comprehensive location information—not the sort of short-term, non-comprehensive location information at issue here." (*Id.* at 20.) The Government cites several subsequent circuit court

decisions opining that tower dumps akin to the data collection authorized in the Geofence Warrants may not require a warrant. (*Id.* (citing *United States v. Lauria*, 70 F.4th 106, 129 n.12 (2d Cir. 2023); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021); *United States v. Davis*, 109 F.4th 1320, 1330 (11th Cir. 2024); *United States v. Adkinson*, 916 F.3d 605, 610–11 (7th Cir. 2019)).)

The Supreme Court and the Third Circuit have yet to determine whether a tower dump or geofence qualifies as a search. This Court is cognizant of divergent approaches to this question across jurisdictions. *See McCracken*, 2025 WL 3034953, at *6–7 (providing a landscape of district and circuit court opinions on the application of the Fourth Amendment to tower dump and geofence search issues). The Court is wary of endorsing the Government's suggestion that "short-term" geofence searches are *never* subject to Fourth Amendment scrutiny. (*See* ECF No. 97 at 20.) Thus, the Court will not do so. However, the Court need not delve further into the issue because in this instance law enforcement *did* seek a warrant to collect records from a geofence search. Therefore, the Court proceeds to assess the sufficiency of those warrants without an extensive constitutional analysis. *See McCracken*, 2025 WL 3034953, at *7 (declining to analyze whether government actions amounted to a search because the government had sought warrants covering the relevant activities); *United States v. Savage*, No. 23-454, 2024 WL 3295586, at *3 (E.D. Pa. July 3, 2024) (same).

### 2. Particularity

"The Fourth Amendment specifies only two matters that the warrant must particularly describe: 'the place to be searched' and 'the persons or things to be seized.'" *United States v. Tutis*, 216 F. Supp. 3d 467, 480 (D.N.J. 2016) (quoting *United States v. Grubbs*, 547 U.S. 90, 97 (2006)).

"The manifest purpose of this requirement was to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

Defendant asserts that the Geofence Warrants amounted to "suspicionless device-dragnets" that contravene the Fourth Amendment's particularity and probable cause requirements. (ECF No. 72 at 6 (citing *Katz*, 389 U.S. at 351–53; Gates, 462 U.S. at 238).) Defendant also argues that the warrant was an impermissible general warrant because it sought "any device present" in the geofence area rather than evidence tied to a known suspect. (*Id.* (citing *Mapp v. Ohio*, 7 U.S. 643, 655–57 (1961)).) Defendant here directs the Court to *Chatrie*, 590 F. Supp. 3d 901, and asserts that the court held that "the geofence warrant there, similar to the warrant here, 'clearly violates the Constitution.'" (*Id.* 6–7.)[6] Finally, Defendant avers that location tracking based on "mass device sweeps without individualized suspicion" offends the reasonable suspicion mandate in *Terry v. Ohio* and the individual privacy protections in *Katz v. United States*. (*Id.* at 12 (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968); *Katz*, 389 U.S. at 351–53).)

In response, the Government contends that the Geofence Warrants met the particularity requirement because they sought information for a brief time window (thirty minutes for the Delaware Attempted Robbery and forty-five minutes for the Springfield Attempted Robbery) and were limited to the 0.25-mile radius around each robbery. (ECF No. 97 at 12.) The Government asserts that the geofence search cannot be categorized as a "general search" of T-Mobile records given the geographical and temporal limits established in the warrants. (*Id.* at 13 (citing *Garrison*, 480 U.S. at 84; *United States v. James*, 3 F.4th 1102, 1106 (8th Cir. 2021)).)

---

[6] The Court has been unable to find the language that Defendant quotes in the cited case. The *Chatrie* court did conclude that "this particular geofence warrant plainly violates the rights enshrined in [the Fourth] Amendment." 590 F. Supp. 3d at 905.

The Court finds that the warrant was sufficiently limited in geography and time so as to satisfy the Fourth Amendment's particularity requirement. As Defendant notes, the geofence search likely did result in collection of Timing Advance data associated with devices unrelated to the robberies being investigated. (*See* ECF No. 72 at 6.) However, courts have recognized that while government searches—including tower dump and geofence searches like those at issue here—may have collateral effects on the privacy rights of innocent people, those searches do not necessarily violate the Constitution where standards of reasonableness, probable cause, and particularity are met. *See McCracken*, 2025 WL 3034953, at *9 (collecting cases). The Court finds those standards are met. The Geofence Warrants here met the particularity requirement because they were clearly limited geographically to the 0.25-mile radius from the site of the robberies being investigated and temporally for thirty-minute and forty-five-minute periods. *See James*, 3 F.4th at 1106 (holding that geofence warrants were sufficiently definite where they were constrained to cover only the cellular towers near each robbery for a period of ninety minutes); *McCracken*, 2025 WL 3034953, at *10 (finding geofence warrants sufficiently particular where they were limited to cell phone records for periods of twenty to thirty minutes in designated 0.2-0.5-mile radii). Defendant's reliance on *Chatrie* is improper given that the warrant at issue there was a Google geofence warrant that contained less precise parameters than the Geofence Warrants. The *Chatrie* court noted that Google's geofence search allowed the government to collect "*all* location points for identified users over an expanded timeframe" with "no geographic barrier confines." 590 F. Supp. 3d at 916. As the Court noted above, that clearly differs from the restricted data collection authorized by the Geofence Warrants here.

### 3. *Probable Cause*

As explained above, a finding of probable cause requires the magistrate judge to decide whether "given all the circumstances set forth in the affidavit before him, there is a fair probability

that contraband or evidence of a crime will be found in [the] particular place" to be searched. *Gates*, 462 U.S. at 238. The reviewing court affords "great deference" to a magistrate's determination of probable cause, and must uphold their finding if there was a "substantial basis for a finding of probable cause." *Id.* at 236; *Jones*, 994 F.2d at 1054. "The supporting affidavit must be read in its entirety and in a common sense and nontechnical manner." *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993).

Defendant asserts that the Geofence Warrants lacked probable cause because it did not provide a specific nexus between any identified device and the criminal activity being investigated. (ECF No. 72 at 7.) Defendant notes that the affidavit in support of the Geofence Warrants stated that it was "highly likely" that the information obtained from executing the warrant "would contain the device owned by the offender/suspect." (*Id.*) Defendant argues that this approach does not comport with the "fair probability standard" set in *Gates*, 462 U.S. 213. (*Id.*) In response, the Government contends that the affidavit in support of the Geofence Warrants provided a clear nexus between the location information sought and the similarities between the robberies being investigated, and that the investigator made a reasonable inference, based on specialized training and experiences, to conclude that it was likely the perpetrator was carrying a cell phone during the robberies. (ECF No. 97 at 9–11.) The Government also avers that warrants of this kind are frequently upheld. (*Id.* at 12.)

In this instance, the Geofence Warrants demonstrated probable cause. The detailed affidavit supporting the warrants included a description of each of the crimes being investigated and the investigative process to date, and noted that Det. Cartwright believed the same individual had committed the Delaware Attempted Robbery and the Springfield Attempted Robbery. (ECF No. 74 at 4–6.) The affidavit went on to explain that based on Det. Cartwright's knowledge and

14

experience, "mobile devices and Smartphone's [sic] have become an intricate part of everyday life because they are now owned by most people" and that "[i]ndividuals involved in criminal activity, including robbery investigations, use cellular telephones to contact coconspirators and trusted confederates to plan and discuss their criminal activities." (*Id.* at 6.) Furthermore, the affidavit noted that based on Det. Cartwright's training and experience and the facts to date, information from cellular service providers can "reveal cell towers . . . that were used and the estimated location information . . . of a given cellular device . . . to show that the device was in the general vicinity of the cell tower or an estimated location at the time the communication or network interaction occurred." (*Id.* at 7.) Moreover, contrary to Defendant's assertion, Det. Cartwright also explained that she believed there was a "strong possibility" that if an actor's phone appeared at one location, they would appear at multiple locations, and that if she could identify a common device at each robbery location, "further investigation into phone numbers, subscriber information and call detail records can be conducted to further the investigation . . . ." (*Id.* at 8.) Thus, the warrant provided information sufficient to give the magistrate judge a rational basis to find probable cause.

Defendant incorrectly implies that investigators were required to demonstrate that the suspect being investigated used a cell phone in the commission of his crimes. (ECF No. 72 at 7.) But a magistrate judge may find probable cause where, as here, officers applying for a warrant demonstrate that there is a "*fair probability* that contraband or evidence of a crime will be found" in the place to be searched. *Gates*, 462 U.S. at 238. The magistrate judge did not exceed the bounds of reason by inferring that an individual committing robberies in 2024 would carry or use a cellular phone during those activities, and that cellular carrier records from the areas around the robberies would assist in identifying that individual. *See James*, 3 F.4th at 1105 (finding that affidavits in support of tower dump warrants showed a fair probability that cellular tower records would

15

identify a robber because "phones are common and, even if there was no direct evidence that the robber had one, criminals will, in the investigator's training and experience, use them to contact co-conspirators during or after committing a crime").

### 4. *Good Faith*

"The good faith exception instructs that suppression of evidence is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (citation modified). The existence of a warrant is typically sufficient to prove that an officer conducted a search in good faith. *Id.* at 308. However, an officer's reliance on a warrant would not be reasonable when: (1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) the magistrate abandoned their judicial role and failed to perform their neutral and detached function; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. *Id.*

Defendant asserts that suppression is warranted because law enforcement could not reasonably rely on geofence warrants that authorized non-particularized searches of all devices in the geofence area. (ECF No. 72 at 11, 13.) But, as the Government notes (*see* ECF No. 97 at 16), there are very few situations in which a warrant will be so lacking as to render an officer's belief in its validity unreasonable—and no such circumstances exist here. The Geofence Warrants were supported by a detailed affidavit that established probable cause and described the geofence areas to be searched. Moreover, geofence warrants of this type are frequently issued by magistrate judges and upheld by reviewing courts. (*Id.*; ECF No. 74 at 7 (indicating Det. Cartwright's prior experience with this type of search).) Thus, officers reasonably relied on the magistrate judge's

16

issuance of the Geofence Warrants when conducting the geofence search. As such, the good faith exception would apply.

### C.  Jurisdictional Challenge

Defendant asserts that the Montgomery County Court of Common Pleas exceeded its jurisdiction by authorizing the Geofence Warrants. (ECF No. 72 at 8–10.) Defendant first argues that the court only has the authority to issue warrants to seize property within its jurisdiction, which does not extend to Delaware County, Pennsylvania. (*Id.* at 9.) Defendant cites no case law in support of this assertion. Defendant also avers that the Montgomery County Court did not have jurisdiction to issue the geofence warrant as it applied to Claymont, Delaware because that robbery site lies outside the Eastern District of Pennsylvania. (*Id.* (citing Fed. R. Crim. P. 41(b)(1).) The Government responds that the warrant was authorized by the Montgomery County Court in accordance with Federal Rule of Criminal Procedure 41(b)(1), as one of the crimes under investigation—the Abington Robbery—occurred within the court's jurisdiction of Montgomery County. (ECF No. 97 at 22.)

The Third Circuit has emphasized that [w]hen state officials conduct a search with little or no federal involvement, the evidence will be admissible in federal court so long as it meets federal constitutional requirements." *United States v. Primo*, 223 F. App'x 187, 190 (3d Cir. 2007). Accordingly, challenges to a constitutionally valid search and seizure on the grounds of a Rule 41 violation are "unavailing." *Id.* at 191 n.3 (citing *United States v. Piver*, 889 F.2d 881, 882 (9th Cr. 1990)); *Piver*, 889 F.2d at 882  ("[S]earches conducted by state officers with state warrants issued by state judges, with minimal or no federal involvement, are not to be judged by the specific provisions of Rule 41 but must only conform to federal constitutional standards."). Here, as detailed above, the warrants met Fourth Amendment requirements of probable cause and

particularity, and thus conform with federal constitutional standards. Moreover, for the reasons stated in the preceding section, the good faith exception would apply to prevent exclusion of the evidence here. *See United States v. Matthews*, 597 F. Supp. 3d 694, 705–07 (D.N.J. 2022) (applying the good faith exception to preclude suppression based on defendant's assertion that municipal court judge lacked authority under state law to issue warrant at issue).

### D.  Warrant Execution

Defendant asserts that the government exceeded the scope and particularity of the Geofence Warrants by initially seeking "'non-content' identifiers" and then "us[ing] the returns to perform cross-scene correlation and then to demand full records for the single device, ultimately supporting broad forensic searches and historical CSLI locational mapping across months." (ECF No. 72 at 12.) He argues that the geofence search returns must therefore be suppressed. (*Id.*) Defendant cites no case law in support of this assertion. The Government's opposition does not directly respond to the statement.

The Court is perplexed as to what alleged wrong or constitutional violation Defendant believes the Government committed here. By the Court's reading, Defendant asserts that the Government "exceeded the scope and particularity [of the warrant] by leveraging geofence returns." But Defendant provides no support for the proposition that the Government is limited in what it may do with the records obtained via execution of a search warrant or that law enforcement's subsequent investigative chain is restricted by the terms of a prior valid warrant. Even if that were the case, the Geofence Warrant affidavit explicitly states that "[i]f even one lone device is discovered through [the warrant], further investigation into phone numbers, subscriber information and call detail records can be conducted to further the investigation to identify any co-conspirators." (ECF No. 74 at 8.) Thus, the issuing court was apprised of the potential future

18

leveraging of the geofence returns—indeed it was likely a key factor in its decision to authorize the search. Defendant's argument that law enforcement violated the terms of the Geofence Warrants by following up on the evidence obtained from the search is therefore unpersuasive.

### E. Fruit of the Poisonous Tree

Defendant asserts that the ensuing identification of the IMSI and IMEI that was collected via execution of the Geofence Warrants, the linkage of the IMSI/IMEI to Defendant's 717 number, and the subsequent warrants for the iPhone search and AT&T records were direct fruits of the initial unconstitutional Geofence Warrants, and therefore any evidence derived therefrom must be suppressed. (ECF No. 72 at 8, 10–11.) Similarly, Defendant avers that all evidence obtained in the hotel room and vehicle searches must also be suppressed as derivative fruits of the invalid Geofence Warrants. (*Id.* at 11–12.)

Because the Court has determined that the Geofence Warrants were valid and executed appropriately, Defendant's fruit of the poisonous tree arguments fail.

## VI.    CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (ECF No. 72) is denied. An appropriate Order follows.

**BY THE COURT:**

**/s/ Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**

19